UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALIOUNE DRIVER,                                              :

                       Petitioner,                   :

                - v. -                              :

R. COVENY,                                                   :

                     Respondent.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

19 Civ. 3860 (DC)

APPEARANCES:      ALIOUNE DRIVER
                      Petitioner *Pro Se*
                      DIN 14-A-0804
                      Attica Correctional Facility
                      639 Exchange Street
                      Attica, NY 14011

                      ERIC GONZALEZ, Esq.
                      Kings County District Attorney
                      *By*:    Solomon Neubort, Esq.
                                  Assistant District Attorney
                      350 Jay Street
                      Brooklyn, NY 11201
                                Attorney for Respondent

CHIN, Circuit Judge:

         On November 14, 2013, in the Supreme Court of the State of New York,

Kings County, petitioner Alioune Driver was convicted, following a jury trial, of one

count of depraved-indifference second-degree murder, in violation of N.Y. Penal Law

§ 125.25(1), three counts of depraved-indifference first-degree assault, in violation of

N.Y. Penal Law § 120.10(1) and (3), one count of first-degree reckless endangerment, in violation of N.Y. Penal Law §§ 120.25 and 125.20, and one count of second-degree criminal possession of a weapon, in violation of N.Y. Penal Law § 265.03(1)(b) and (3). *See* Dkt. 11 at 2, 17.  The charges related to a June 9, 2011, incident in which Driver and other members of the Crips gang fired their guns into a crowded boardwalk at Brighton Beach, Brooklyn.  *See id.* at 1.  The gunfire left one person dead and four others seriously injured.  *Id.*  On December 19, 2013, the court sentenced Driver principally to a total of sixty-five years' imprisonment and five years' post-release supervision.  *Id.* at 18.

On June 21, 2019, proceeding *pro se*, Driver petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  Dkt. 1.  The Court entered a stay to allow Driver to exhaust his state remedies, *see* Dkts. 3, 7, 10, and subsequently, on December 2, 2020, the Kings County District Attorney's Office, representing Respondent, filed its opposition to the Petition, Dkt. 11.  Driver thereafter filed an amended Petition.  Dkts. 14, 15.  Respondent did not file a response.  In the meantime, on February 10, 2023, Driver moved for the appointment of counsel.

The case was reassigned to me on May 12, 2023.  For the reasons set forth below, the Petition, as amended, and Driver's motion to appoint counsel are DENIED.

## STATEMENT OF THE CASE

I.      *The Facts*[1]

Evidence from the People's case at trial demonstrated the following:

June 9, 2011, was "Brooklyn-Queens Day."  The weather was warm, New York City public schools were closed, and beaches and boardwalks in the two boroughs were crowded.  Dkt. 11 at 2.  Niaquwana Williams, who was twenty-two years old, and her aunt Tyesha Jones, who was sixteen, traveled to Brighton Beach to meet friends.  *Id.*  On the subway, they met a group of young men from the Bronx, including Tykwan Beckett, Kareem Askew, and James White, who were heading to the beach at Coney Island.  *Id.*  They all got off the subway together at Coney Island, and Williams and Jones headed down the boardwalk to Brighton Beach.  There, they met Williams's friends, including Wayne Gibbons, Trent Turner, and Calvin Berkley.  *Id.* at 2-3.

The men from the Bronx decided to head down the boardwalk to Brighton Beach as well.  *Id.* at 3.  Along the way, a group of strangers warned them that Crips gang members at Brighton Beach had BB guns.  *Id.*  None of the men in the group from the Bronx was a member of a gang, and they continued on to Brighton Beach undeterred.  *Id.*  At Brighton Beach, the Bronx group again encountered Williams and Jones, who were with their friends, near Tatiana's Restaurant at Brighton 6th Street.  *Id.*

---

[1]      The facts are primarily drawn from the affidavit submitted in opposition to the Petition. The recitation of facts in the affidavit is supported by detailed citations to the record, including the transcript of the trial and other proceedings. *See* Dkt. 11.

3

At approximately 5:20 p.m., Turner, Beckett, Askew, White, and Williams saw men on the beach who were dressed in blue, a Crips gang color, and were impersonating the sounds or "calls" of the rival Bloods gang. *Id.* at 3-4. Another bystander, Errol Mack, who was a former member of the Bloods gang, noticed a group of between eight and eighteen Crips members calling out Bloods call signs. *Id.* at 4. Mack recognized Driver, the petitioner, from having seen him occasionally in the neighborhood where they both lived. Mack observed that Driver had gold fronts on his teeth and tattoos on his arms; Driver was wearing a blue-and-white-striped polo shirt, a blue bandana, and a hat on top of the bandana. *Id.*

Some four to eight of the Crips members approached the boardwalk and stood a few feet away from Williams. *Id.* at 4-5. She, too, observed that one of them was wearing a blue-and-white-striped shirt. *Id.* at 5. While the men with Williams were generally facing away from the beach, "minding their own business," at some point Askew looked at the approaching Crips members "with a look of disgust," then "everything began." *Id.* One Crips member hit Askew in the head with a bottle, and another swung a stick or cane at someone else on the boardwalk. *Id.* Mack saw one Crips member pull out a gun from his front waistband and begin firing. *Id.* Turner saw two Crips members "fuss with their shirts"; then, he heard gunshots ring out. *Id.* Williams, too, heard gunshots but did not see who fired them. She threw herself to the sand, with Jones next to her. *Id.* at 5-6.

4

Mack observed Driver pull a gun from the right side of his waistband and fire one or two rounds. *Id.* at 6. Mack also saw a shooter fire two rounds; in addition, he heard shots coming from the direction of Tatiana's Restaurant and thought men on the boardwalk may have returned fire. *Id.* He did not, however, see anyone fire from the boardwalk. *Id.*

Bullets hit Jones, White, Beckett, Gibbons, Berkley, and Julien Boudet, a French tourist who was walking to Tatiana's Restaurant to meet a friend. *Id.* at 6-7. Jones screamed to Williams that she was shot, then lost consciousness. *Id.* at 7-8. Williams saw the shooters, as they were still shooting, run toward the ocean to blend in with the crowd; after the shooting stopped, Williams saw Driver running toward Brighton 6th Street. *Id.* at 8.

Jones subsequently died from a bullet that perforated her lungs and hit her spinal cord. *Id.* at 13. Berkley, Gibbons, Beckett, and Boudet reported serious physical and psychological injuries, including some that persisted through the time of trial. *Id.* at 13-14.

That day, additional police officers had been deployed to the beach to maintain safety. *Id.* at 8. When officers heard gunshots coming from the direction of Brighton 6th Street, they ran in that direction and, upon arriving in the vicinity of Tatiana's Restaurant, saw four people lying on the boardwalk. *Id.* One pair of uniformed officers, Police Officers Islam Shafik and Angelika Kaiser, were sitting in

their patrol car when they heard the gunshots. *Id.* at 8-9. They headed quickly toward

the beach, passing people who were running from the shootings. *Id.* at 9. Officer Shafik

noticed a group of three men, including Driver, who were not running. *Id.* But when

Officer Shafik and Driver made eye contact, Driver and the men with him began to run.

Officer Shafik pursued them, put out a description of Driver, but lost sight of him. *Id.*

Lieutenant Peter Carretta, meanwhile, went with two other officers to the Brighton

Beach subway station because they thought the subway would be the quickest way for

the shooters to flee the area. *Id.* at 9-10. At the subway station, Lieutenant Carretta

heard Officer Shafik's description of Driver, spotted Driver heading in the direction of

the station, and pursued him. *Id.* at 10. Lieutenant Carretta shouted "police" at least

twice, but Driver headed up the stairs to the station and jumped the turnstile. *Id.* Only

on the platform did Lieutenant Carretta bring Driver to the ground. *Id.* Lieutenant

Carretta then brought him to the 60th Precinct. *Id.* at 11.

   At the precinct, Detective Michael Habert interviewed Driver, who

waived his *Miranda* rights. *Id.* Driver said he knew nothing about the shootings and

had been arrested only for jumping the subway turnstile. *Id.* When Detective Habert

challenged Driver, Driver admitted that, first, he had been on the beach, then, he had

been further up the sand, and then, he had been near where the shots were fired. *Id.*

Driver maintained that the only thing he had in his hand was a bottle of Ciroc vodka

and that he was no longer a gang member. *Id.* Driver gave Detective Habert the names

6

of several people he alleged were involved in the shooting. *Id.* The next morning, June

10, Driver was released and driven home by the police because none of the witnesses

had identified him. *Id.* Later that day, Driver telephoned Detective Habert and claimed

that a person named "Chunka" was involved in the shooting. *Id.* at 12. Detective

Habert learned that Chunka was in prison and confronted Driver with that fact. *Id.*

Driver admitted he had known Chunka was incarcerated. *Id.*

      Around midnight or 1 a.m. the next day, June 11, Mack called the Crime

Stoppers telephone line and said he had information about the shooting. *Id.* Upon

being interviewed by the police, Mack described one of the shooters as a "dark-

complexioned black man, with gold fronts on his teeth, wearing a blue and white

striped polo shirt, with a doo-rag, or bandana, on his head, with his hair in braids, and

with tattoos on his arms." *Id.* The detectives realized this description matched Driver,

and, therefore, on June 12, they arrested Driver at the fast-food restaurant in Queens

where he worked. *Id.* Mack and Williams identified Driver in police lineups, and the

police executed a search warrant at Driver's home, finding a set of gold fronts for upper

teeth. *Id.* at 12-13.

      On June 13, a police attendant watching suspects who were in a holding

cell, awaiting arraignment, heard Driver and another man discuss how many Crips

gang "points" were earned for "body counts." *Id.* at 13. Driver said "that twenty gang

points are earned for killing someone, and that he expected to earn twenty points." *Id.*

Prior to trial, police recovered footage from surveillance cameras in the vicinity of the shooting. *See id.* at 14-16. Footage from at least three cameras showed Driver heading away from the scene, seconds after the crowd begins to run. *See id.* Footage from a camera inside Tatiana's Restaurant was blurry and pixilated, so it was unclear whether a person in the video, who is running past the restaurant and appears to be wearing a striped shirt, was in fact wearing a striped shirt. *Id.* at 15.

II.   *State Court Proceedings*

A.   *The Trial and Sentencing Proceedings*

Trial began October 15, 2013, *see* Dkt. 11-2 at 1, and concluded November 12, 2013, *see* Dkt. 11-12 at 1.

Following the conclusion of the People's case, the defense called three witnesses. *See* Dkt. 11 at 16-17. Randy Delacruz, who had been sitting with his uncle outside Tatiana's Restaurant, facing the beach, when the shooting began, testified he saw two men firing guns from the beach. *Id.* He said one shooter was wearing a bucket hat; he did not see the face or clothing of the second shooter. *See id.* Frank Piazza, an expert in video enhancement, testified that the Tatiana's Restaurant footage does not depict a person in a striped shirt passing the restaurant until more than a minute after the crowd began running. *Id.* at 17. Piazza acknowledged the footage was so unclear it was not possible to tell even the gender of the person who appeared to be wearing the striped shirt. *Id*. Last, Detective Juan Cragh testified that, when he interviewed Askew

during his investigation of the shooting, Askew told Cragh he was hit in the back of the head by a black man wearing a yellow bucket hat.  *Id.*

The jury found Driver guilty of six counts: one count of depraved-indifference second-degree murder, three counts of depraved-indifference first-degree assault, and one count each of first-degree reckless endangerment and second-degree criminal possession of a weapon.  *Id.* at 17.

On December 19, 2013, the court sentenced Driver to a total of sixty-five years' imprisonment, consisting of consecutive terms of twenty-five years to life on the murder count and twenty years, twelve years, and eight years, respectively, on the three assault counts, all these terms to run concurrently with concurrent terms of imprisonment of twenty-eight months to seven years on the reckless endangerment count and fifteen years on the weapons possession count.  *Id.* at 18.  The court also imposed five years' post-release supervision.  *Id.*

B.     *The Appeal and Post-Conviction Proceedings*

With the assistance of counsel, Driver appealed his conviction to the Appellate Division, Second Department, raising the same five claims contained in the Petition:  (1) the evidence was legally insufficient to support the verdict and the verdict was against the weight of the evidence; (2) the court, during jury selection, allotted Driver too few peremptory challenges; (3) prosecutorial misconduct denied Driver a fair

trial; (4) the court, in taking the jury's verdict, violated the procedures set forth in N.Y.

Crim. Proc. Law § 310.50(2) and (5); and (5) the sentence was harsh and excessive.  *Id.*

On October 25, 2017, the Appellate Division affirmed the conviction.

*People v. Driver*, 64 N.Y.S.3d 222, 223 (2d Dep't 2017) ("*Driver I*").  The Appellate Division

held that the trial court's jury selection procedures were not improper, the evidence was

legally sufficient, the verdict was not against the weight of the evidence, and Driver's

claims that the prosecutor engaged in misconduct and the court erred in taking the

verdict were unpreserved for appellate review.  *Id.* at 223-24.  Moreover, the Appellate

Division concluded that the sentence was not excessive.  *Id.* at 224.  Subsequently, the

Court of Appeals denied leave to appeal.  *People v. Driver*, 102 N.E.3d 438 (N.Y. 2018)

(Feinman, J.) ("*Driver II*").

On May 29, 2019, proceeding *pro se*, Driver applied to the Appellate

Division for a writ of error *coram nobis*, alleging various errors on the part of his

appellate counsel.  Dkt. 11-19.  The Appellate Division denied the application on

November 13, 2019.  *People v. Driver*, 110 N.Y.S.3d 343, 343-44 (2d Dep't 2019) ("*Driver III*").

C.     *Driver's Petition and Proceedings in This Court*

Driver filed the Petition on June 21, 2019.  Dkt. 1.  Four days later, he

moved that the Petition be held in abeyance so he could exhaust his state remedies.

10

Dkt. 3.  Respondent consented to a stay, and this Court granted Driver's motion on August 1, 2019.

On December 26, 2019, Driver wrote to the Court to indicate he wished for the Petition to be considered, notwithstanding his not having pursued collateral relief in the state courts.  Dkt. 10 at 1.  Driver alleged that he was "being prevented from pursuing any further state collateral relief, due to the District Attorney . . . refusing to turn over crucial evidence" in response to Freedom of Information Law requests Driver had made.  *Id.*  The Court lifted the stay on November 2, 2020, and Respondent filed opposition papers on December 2, 2020.  Dkt. 11.  Driver replied on February 8, 2021.  Dkt. 13.

On March 14, 2021, Driver moved to supplement his Petition with a sixth ground for relief, arguing that the evidence showed only that he was present during the shootings.  Dkt. 14 at 3.[2]  The Court ordered Respondent to respond to Driver's motion to amend the Petition and, when Respondent did not respond, the Court granted Driver's motion on August 30, 2021.  *See* Dkt. Sheet at 5.

More than a year later, on May 9, 2022, Driver wrote a letter to the Court with further arguments in support of the Petition.  Dkt. 17.  Then, on February 10, 2023, he moved for the appointment of counsel.  Dkt. 18.

---

[2]    Driver also submitted a typed version of the amended portions of the Petition.  *See* Dkt. 15.

The case was reassigned to me on May 12, 2023.

*DISCUSSION*

I.   *Federal Review of State Convictions*

As a threshold matter, 28 U.S.C. § 2254 provides that federal courts may review state court convictions only where the petitioner is or was "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citation and internal quotation marks omitted).

A federal court may not grant a habeas petition where the petitioner is or was in custody pursuant to a judgment of a state court unless the petitioner "has exhausted the remedies available in the courts of the State" or such process is unavailable or ineffective. 28 U.S.C. § 2254(b)(l)(A)-(B); *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) ("[A] state prisoner is required to exhaust all of his available state remedies before a federal court can consider his habeas application.").

Moreover, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citation and internal quotation marks omitted). That is, federal courts may not review a state court ruling that "fairly

appear[s] to rest primarily on state procedural law," so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (alteration in original) (citations omitted).  Federal courts in this Circuit have repeatedly held that the gatekeeping provisions of New York law that govern a petitioner's failure to raise a claim on direct appeal "represent[] the application of a 'firmly established and regularly followed' New York rule." *Williams v. Goord*, 277 F. Supp. 2d 309, 318-19 (S.D.N.Y. 2003) (citations omitted).

Next, a federal court may not grant a habeas petition with regard to a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state court must be accorded "substantial deference." *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam).

13

II.     *Analysis*

Construed liberally, the Petition raises five claims:  (1) the evidence was legally insufficient to support the verdict, and the verdict was against the weight of the evidence, not least because the jury was confused by the multiple theories of the crime that the People charged and because the evidence showed only that Driver was present at the scene of the shootings;[3] (2) the court, during jury selection, violated N.Y. Crim. Proc. Law § 270.25(2) by allotting Driver too few peremptory challenges; (3) the prosecutor denied Driver a fair trial by, *inter alia*, vouching for witnesses Mack and Williams, and Driver's counsel was ineffective for failing to object to the misconduct; (4) the jury failed to render a verdict consistent with N.Y. Crim. Proc. Law § 310.50 because it rendered verdicts on counts the court had directed jurors to skip, and the court failed to ensure compliance with its instructions; and (5) the sentence was excessive.  Dkt. 1 at 7, 11, 14; Dkt. 15 at 32-27.

Subject to exceptions described below, Driver has exhausted his state remedies as to all five of his claims.  *See* 28 U.S.C. § 2254(b)(l)(A).  He included each claim in his appeal to the Appellate Division and his application for leave to appeal to the Court of Appeals.  The Appellate Division denied all five claims on the merits, *see Driver I*, 64 N.Y.S.3d at 222-24, and the Court of Appeals denied leave to appeal, *see*

---

[3]     This summary, and the discussion that follows, combines the first ground Driver enumerated in the original Petition, Dkt. 1 at 7, with the additional ground he raised in the amended Petition, Dkt. 15 at 32-27.  Both grounds relate to the sufficiency of the evidence.

*Driver II*, 102 N.E.3d 438.  I therefore accord the state courts' holdings "substantial deference."  *Fischer*, 780 F.3d at 560.  I address each claim in turn.

### A.     *The Sufficiency of the Evidence Claim*

The first and primary claim Driver advances in the Petition is that the evidence was insufficient to convict him and the verdict was against the weight of the evidence.  *See* Dkt. 1 at 7; Dkt. 14 at 3-10; Dkt. 15 at 20-26, 32-37.  According to Driver, the evidence at trial established merely that he was present when the shootings occurred, not that he himself fired a weapon or acted in concert with those who did.  *See* Dkt. 15 at 32-33.[4]  Driver's claim fails.

Defendants in a criminal trial may be convicted only upon proof establishing their guilt beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 323 (1979).  When considering a claim that the evidence introduced at trial was insufficient to sustain a defendant's conviction, the reviewing court applies the standard

---

[4]      The gravamen of Driver's claim is that the evidence establishes nothing more than his presence at the scene of the shootings, but he also argues in passing that he was wrongfully convicted on the theory that, although he did not shoot, he acted in concert with those who did.  *See, e.g.*, Dkt. 15 at 21-22.  The prosecution did argue that Driver and the other shooters acted in concert.  *See, e.g.*, Dkt. 11-11 at 239-40.  But contrary to Driver's assertion, the People specifically contended -- and the jury found -- that Driver was one of the men who deliberately opened fire on a crowded beach.  *See id.* at 237-38, Dkt. 11-12 at 237.  The passages of the sentencing transcript to which Driver points, moreover, are unavailing.  Jones's father Kevin Wilson, speaking at sentencing and directing his comments to Driver, observed that "whether it was you or not who fired the fatal bullet who killed my daughter, you're just as guilty."  Dkt. 11-12 at 224.  After Driver stated he did not fire a gun, the trial judge said that "the credible, believable evidence that the jury heard is that you were acting in concert.  And while Mr. Wilson might have said whether you did it or didn't do it, the fact is you participated."  *Id.* at 236-37.

set forth in *Jackson* to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.  In doing so, the court defers to the jury's assessments on both "the weight of the evidence [and] the credibility of witnesses." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).  Furthermore, the court "must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002).  A "[p]etitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." *Id.* (internal quotation marks and citation omitted).  Indeed, a federal court may overturn a state court decision rejecting a sufficiency of the evidence challenge only if the state court decision was "objectively unreasonable." *Coleman v. Johnson,* 566 U.S. 650, 651 (2012) (internal quotation marks and citation omitted).

Here, the Appellate Division held that, "[v]iewing the evidence in the light most favorable to the prosecution," the evidence was "legally sufficient to establish the defendant's identity as one of the shooters." *Driver I,* 64 N.Y.S.3d at 223.  Moreover, the Appellate Division, upon conducting its own review of the evidence, held that "the verdict of guilt was not against the weight of the evidence." *Id*. at 224.

The Appellate Division's holding was not objectively unreasonable. *See* 28 U.S.C. § 2254(d).  The evidence at trial included two independent eyewitness identifications -- those of Williams and Mack -- along with Driver's self-incriminating

16

statements in the police holding cell, his false statements to the police, his behavior in

the immediate aftermath of the shooting, and video surveillance footage. Williams and

Mack, who did not know each other, both identified Driver in police lineups as well as

at trial. Mack testified that on the day of the shooting, he saw Driver holding a bottle of

Ciroc vodka -- the same bottle Driver claimed was the only thing in his hand. *See* Dkt.

11 at 11; Dkt. 11-8 at 166. And Mack saw Driver pull a gun and fire it. Dkt. 11 at 6.

Driver's appellate counsel argued that the eyewitness identifications were mistaken, *see*

Dkt 11-13 at 39-40, but, in fact, the identifications were corroborated by compelling

evidence.

      First, Driver himself stated that he "expected to earn twenty points," the

amount associated with killing someone, when he was overheard talking with a fellow

gang member in the police holding cell. *See* Dkt. 11 at 13. In the same conversation, he

also acknowledged he had had a gun. *See id.* Second, Driver made a series of false

statements to police investigating the shootings. He denied that he was on the segment

of the beach where the shootings happened; then, he admitted that he was there but

claimed he did not fire a weapon. He gave the police names of several individuals who

he claimed were involved in the shooting; then, he acknowledged that one of those

individuals was in prison at the time. He denied being a Crips gang member, claimed

he had left the gang, and then bragged that he was about to earn gang points for what

he had done. Moreover, at trial, a police expert testified that it was dangerous for a

former gang member to openly wear tattoos associated with the gang he had left, *see* Dkt 11-10 at 107-08, and yet, on the day of the shootings, Driver was wearing short-sleeved shirts showing his gang tattoos on his arms, *see* Dkt. 11 at 12.

Third, in the minutes after the shootings, Driver's behavior suggested he had something to hide.  He fled when Officer Shafik made eye contact with him.  *See* Dkt. 11 at 9.  Likewise, when Lieutenant Carretta shouted "police" twice when he was pursuing Driver in the vicinity of the Brighton 5th Street subway station, Driver did not stop, ran up the stairs to the station, and jumped the turnstile.  *See id.* at 10.  It is well established that in circumstances like these, flight from the police can be evidence of consciousness of guilt.  *See United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005) (establishing that for flight evidence to be probative, inferences must be drawn "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged").  Driver's behavior clearly constituted flight, and against the backdrop of all the other evidence, inferences to his actual guilt can reasonably be drawn.  *See id.*

Finally, the video surveillance evidence that clearly depicts Driver supported a guilty verdict.  Footage from a camera on the boardwalk shows that Driver and two other individuals, who for a few seconds were running with the crowd that was fleeing the shootings, did not stay with the crowd.  Instead, they passed the exit

ramp that others used to leave the boardwalk, stopped, and began strolling at a slower pace further down the boardwalk. About a minute later, however, when others had stopped running, Driver and his two companions started running again. *See* Dkt. 11-14 at 34-36. The most reasonable inference to be drawn from this unusual behavior is that Driver and his companions, unlike others in the crowd, did not fear being shot because they had been the shooters.

In the Petition, Driver acknowledges that he was present on the boardwalk but claims he was merely "an innocent bystander." Dkt. 15 at 34. Driver's argument rests primarily on the proposition that surveillance footage from the cameras on the boardwalk and at Tatiana's Restaurant depicts him running away from the shootings one to two seconds after the gunfire began, at a time when witnesses testified that he was still on the sand. *See* Dkt. 15 at 23. Driver's claim is both factually and analytically flawed. The witnesses Driver mentions, Williams and Delacruz, did testify that some of the shooters stayed on the sand and ran into the ocean, but they did not specifically testify that *Driver* did so. *See* Dkt. 11-14 at 37-38. Delacruz only saw two of the shooters, and other witnesses testified there were as many as four shooters. *See id*. In the boardwalk surveillance footage, moreover, more than twenty-five seconds elapse between the time the crowd begins to flee and the time a person resembling Driver passes in front of the camera. *See id.* at 39. Thus, there was ample time for Driver to

shoot from the sand, jump the railing onto the boardwalk, and appear on the

surveillance footage.

   As to the camera situated inside Tatiana's Restaurant, Driver's own expert

testified that the footage, captured through a plate-glass window, was so blurry and

pixilated that it was impossible to identify even the gender of the person depicted on

the footage that Driver claims was himself. *See id.* at 43-44. The jury had good reason,

therefore, to conclude Driver did not appear on the Tatiana's footage -- not least that he

could only have done so if, while the crowd was surging away from the beach, he ran

toward the beach and into the line of fire. *See id.* at 45-46. Indeed, as Driver wrote in his

amended Petition, had he known "that anyone will be shooting at people on the

boardwalk he would've never placed himself in the line of fire." Dkt. 15 at 34.

   Taken together and viewed in the light most favorable to the prosecution,

all this evidence confirms that a rational trier of fact could have found that the essential

elements of the charged crimes were established beyond a reasonable doubt. *See*

*Jackson*, 443 U.S. at 318-19. Moreover, there is no colorable argument that the Appellate

Division's decision was objectively unreasonable. *See Coleman,* 566 U.S. at 651. Driver's

claim about the sufficiency of the evidence, therefore, does not merit federal habeas

relief.

**B.**     *The Jury Selection Claim*

Driver's second claim is that "the trial court committed reversible error when it failed to afford [him] the requisite number of peremptory challenges" under N.Y. Crim. Proc. Law § 270.25(2). Dkt. 1 at 7.[5]  After twelve jurors and four alternates were selected and sworn, a juror and an alternate were excused.  During the initial selection process, Driver used ten of the twenty peremptory challenges authorized by statute.  *See* Dkt. 11 at 26.[6]  Once the juror and alternate were excused, the prosecutor and Driver's counsel agreed to excuse the three remaining alternates and select a twelfth juror and four new alternates from a new venire.  *See* Dkt. 11-4 at 4-5.  In the second selection process, the trial court proposed, over Driver's counsel's objection, to give Driver and the People four peremptory challenges each.  Dkt. 11 at 27.  Driver's counsel insisted that he should be able to exercise up to all ten of his remaining peremptory challenges.  *See* Dkt. 11-4 at 174-77.  The court overruled the objection but stated that it would be willing to "revisit," if needed, its decision to allocate four peremptory challenges to each side.  *See id.* at 178.  In the end, the defense did not use any peremptory challenges when the final juror was selected; Driver used two peremptory challenges during the selection of the alternates.  *See id.* at 179-85.

---

[5]     As the Appellate Division noted, because the jury had been sworn at the time the contested events occurred, Driver's challenge is governed by section 270.35(1), not section 270.25(2), of the Criminal Procedure Law.  *See Driver I*, 64 N.Y.S.3d at 223.

[6]     Driver's Petition claims that he used "0 out of 20" peremptory challenges and "should have had 10 more."  Dkt. 1 at 11.  The figure of 0 is plainly a typo.

As he did on his direct appeal, Driver argues in the Petition that he should have been allotted ten peremptory challenges, the number remaining to him after the initial jury was selected, during the second jury selection process.  Dkt. 1 at 11.

The Appellate Division held that the district court committed no error because, although New York law directs that once a jury has been sworn, a discharged juror should be replaced "by the alternate juror whose name was first drawn and called," N.Y. Crim Proc. Law § 270.35(1), a defendant "may waive compliance with the statutory procedures," *Driver I*, 64 N.Y.S.3d at 223.  The Appellate Division noted that Driver's counsel, the People, and the court all concurred in the non-standard procedure for selecting the final juror.  *See id.*

Driver's claim is not cognizable on federal habeas review because he is not alleging a violation of the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2254(a).  "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  There is no federal constitutional right to peremptory challenges, and states may choose to "withhold [such] challenges altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." *Rivera v. Illinois*, 556 U.S. 148, 152 (2009) (internal quotation marks and citation omitted); *see also Georgia v. McCollum*, 505 U.S. 42, 57 (1992).

Even were Driver's claim cognizable by this Court, the Appellate Division's holding was not contrary to nor involved an unreasonable determination of

federal law or the facts of the case.  *See* 28 U.S.C. § 2254(d)(1)-(2).[7]  Moreover, when it

came to selecting the replacement juror, Driver did not exercise any of the peremptory

challenges allotted to him, nor did he exhaust his four peremptory challenges during

the selection of the alternates.  Therefore, Driver was not prejudiced by any error of

state law on the part of the trial court.  *See* Dkt. 11 at 28.[8]

      For these reasons, Driver is not entitled to federal habeas relief on his

claim about the jury selection process.

**C.**    *The Prosecutorial Misconduct Claim*

      Third, Driver argues that the prosecutor made comments in summation

that improperly bolstered prosecution witnesses Mack and Williams.  Dkt. 1 at 11.  The

---

[7]    The Appellate Division's summary of the jury selection proceedings was, nevertheless, not a model of clarity.  The Appellate Division noted that "at the urging of both parties, the court instead allowed the parties to select a juror from a new panel of prospective jurors." *Driver I*, 64 N.Y.S.3d at 223.  It also commented that "[a]lthough [N.Y. Crim. Proc. Law §] 270.35 directs the court to replace the discharged juror with the first alternate, a defendant may waive compliance with the statutory procedures, as the defendant did here." *Id.* (citations omitted). The Appellate Division was correct that Driver and the People agreed to select the final juror and new alternates from a second venire, but Driver's claim -- in the Petition just as on direct appeal -- concerns the *number* of peremptory challenges, not the procedure utilized.  *See* Dkt. 1 at 11; Dkt. 11-13 at 42-46.

[8]    Driver argues in the alternative that his counsel was constitutionally ineffective on account of agreeing to depart from the procedures prescribed in N.Y. Crim. Proc. Law § 270.35(1).  *See* Dkt. 1 at 11.  Because Driver was not prejudiced, he cannot establish the second prong of an ineffective assistance claim.  *See Strickland v. Washington*, 466 U.S. 668, 693 (1984). As to the first prong -- that counsel's conduct fell below an "objective standard of reasonableness," *id.* at 688 -- the Petition contains only a conclusory statement, *see* Dkt. 1 at 11. Far from being ineffective in this regard, defense counsel repeatedly raised an objection identical to Driver's claim in the Petition, that is, that the defense should have been allocated ten rather than four peremptory challenges.  *See* Dkt. 11-4 at 174-78.

prosecutor stated that Mack, who identified Driver, had no motive to lie.  Dkt. 11-11 at

234.  As to Williams, the prosecutor said that if "anyone in the world has a reason to

pick the right person" out of a police lineup, it was her.  *Id.* at 233-34.  According to

Driver, by purportedly vouching for Mack's and Williams's credibility and stating that

Williams's personal interest in the case made it more likely her identification was

correct, the prosecutor shifted the burden of proof and deprived him of due process.

Dkt. 1 at 11.  Moreover, Driver adds, he was deprived of constitutionally effective

counsel because his counsel failed to object.  *Id.*  This claim fails both procedurally and

substantively.

The Appellate Division held that Driver's claim about the prosecutors'

remarks was "unpreserved for appellate review" under New York's contemporaneous

objection rule.  *Driver I,* 64 N.Y.S.3d at 223.  That rule provides that state appellate

courts will review only those errors of law that are objected to at the time, such that the

trial court is "reasonably prompted" to correct them.  *Downs v. Lape,* 657 F.3d 97, 103 (2d

Cir. 2011).  The Appellate Division also held that "to the extent that the prosecutor

exceeded the bounds of permissible rhetorical comment, the remarks were not so

egregious as to have deprived the defendant of a fair trial."  *Driver I,* 64 N.Y.S.3d at 224.

The Second Circuit has "held repeatedly that the contemporaneous

objection rule is a firmly established and regularly followed New York procedural rule."

*Downs,* 657 F.3d at 104.  Hence, the Circuit has affirmed the denial of habeas relief based

on the Appellate Division's ruling that the failure of a petitioner to object at trial

rendered a claim unpreserved for appellate review. *See, e.g., Garcia v. Lewis,* 188 F.3d 71,

81-82 (2d Cir. 1999) (affirming denial of habeas relief where petitioner's trial counsel

failed to bring to trial court's attention a claim that he later attempted to advance on

appeal). If a claim is procedurally barred pursuant to an independent and adequate

state rule, a federal court sitting in habeas may not review that claim on the merits,

unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a

result of the alleged violation of federal law," or (2) "that failure to consider the claims

will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722,

750 (1991). Moreover, the procedural bar applies even where, as here, a state court has

announced an alternative holding about the merits of a claim. *See Harris v. Reed,* 489

U.S. 255, 264 n.10 (1989). Driver does not deny his counsel failed to object to the

prosecutor's comments, and he has not shown good "cause for the default and actual

prejudice as a result of the alleged violation" or demonstrated that "failure to consider

the claim will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750.

Therefore, the contemporaneous objection rule bars this Court from considering

Driver's claim about the prosecutor's remarks in summation.

Even were Driver's claim not barred, he has not established that the

prosecutor's comments violated his federal constitutional rights, much less that the

Appellate Division's merits holding was unreasonable. "A criminal conviction is not to

be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding.  In order to reach the level of a constitutional violation, a prosecutor's remarks must so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (alterations adopted) (citations and internal quotation marks omitted).

The prosecutor's remarks did not constitute impermissible vouching.  The Second Circuit has held that it is improper for a prosecutor to imply there is evidence not before the jury or to convey "the imprimatur of the Government" to "induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Williams*, 690 F.3d 70, 76 (2d Cir. 2012) (citations and internal quotation marks omitted).  The Circuit has cautioned, however, that "what might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case."  *Id.* (quoting *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)).

Here, the prosecutor did the latter, arguing that the evidence supported Mack's and Williams's credibility.  *See also Everett v. Fischer*, No. 00 Civ. 6300, 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) ("[F]or a prosecutor to assert in closing argument that witnesses had no reason to lie is perfectly reasonable.  Such arguments do not shift the burden of proof to the defendant." (alterations adopted) (citation and internal quotation marks omitted)).  Moreover, the trial court repeatedly instructed the jury that

the burden of proof never shifted to Driver.  The prosecutor's comments, therefore, did

not violate Driver's right to a fair trial.

Finally, to the extent Driver contends that his counsel was constitutionally

ineffective for failing to object to the prosecutor's statements, he has not established that

counsel's performance "fell below an objective standard of reasonableness" or that the

failure to object prejudiced him.  *Strickland*, 466 U.S. at 688, 693 (1984).  The Petition

advances this argument in a single, conclusory phrase, *see* Dkt. 1 at 11, and Driver's

brief before the Appellate Division did not develop it at any length, *see* Dkt. 11-13 at 50.

In sum, Driver's claim about the prosecutor's remarks is barred by the

contemporaneous objection rule and also fails on the merits.

D.      *The Inconsistent Verdict Claim*

Next, Driver contends that the jury returned an inconsistent verdict

inasmuch as, in connection with Jones's death, it did not comply with the instructions

on the verdict form.  Dkt. 1 at 11, 14.  On the form, the jury placed a checkmark on the

line labeled "guilty" for second-degree depraved-indifference murder; then, instead of

skipping the lesser included charges related to Jones's death as the instructions on the

form directed, the jury checked off "not guilty" for first-degree and second-degree

manslaughter.  Dkt. 11-16 at 1.  Because a note from the jurors suggested the form was

completed incorrectly, Driver claims, the trial court was aware that the jury may have

violated N.Y. Crim. Proc. Law § 310.50, which requires that the "verdict must be in

accordance with the court's instructions."  Nevertheless, he argues, the court took no

corrective action.[9]  Driver also contends that his counsel was constitutionally ineffective

for failing to object to the allegedly inconsistent verdict.  Dkt. 1 at 11, 14.  Driver's claim

is unreviewable and, in any case, lacks merit.

        The Appellate Division concluded that this claim was unpreserved for

appellate review because Driver's counsel "failed to raise the issue before the jury was

discharged."  *Driver I*, 64 N.Y.S.3d at 224.  Even had counsel objected, however, the

Appellate Division held that the verdict "was neither inconsistent nor repugnant"

because it was in accordance with the court's instructions and any inconsistency

appeared only on the verdict sheet.  *Id.*  The inconsistency, therefore, did not affect the

verdict itself because N.Y. Crim. Proc. Law § 1.20(12) defines a "verdict" as the jury's

decision as "rendered and announced by the foreperson of the jury in the courtroom."

*See Driver I*, 64 N.Y.S.3d at 224.

        Like Driver's previous claim, the Appellate Division's holding rests on its

application of New York's contemporaneous objection rule, an independent and

adequate state ground barring federal habeas review.  Driver does not dispute that his

counsel failed to object to the jury's written responses on the verdict sheet.  As before,

---

[9]     This premise of Driver's claim is factually incorrect.  The court did receive and read aloud a note from the jury indicating that it "reached a verdict . . . on all 14 counts" even though "they were supposed to skip counts" on the verdict form.  Dkt. 11-12 at 213.  When the court took the verdict, however, the clerk asked the jury for its verdict only on the counts as to which the jury was instructed to complete the form.  *See id.* at 214-16.

28

he has not shown good cause and prejudice or demonstrated that there is a risk of a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Therefore, the contemporaneous objection rule bars this Court from considering Driver's claim.[10]

Even were Driver's claim reviewable, however, the Appellate Division's holding did not involve an unreasonable application of federal constitutional law. *See Harris v. Rivera*, 454 U.S. 339, 345 (1981) (concluding that on federal habeas review, "[i]nconsistency in a verdict is not a sufficient reason for setting it aside"). And as with his previous claim, Driver has not developed any colorable argument that his counsel, by failing to object to the allegedly inconsistent verdict, "fell below an objective standard of reasonableness" or that counsel's error prejudiced him. *Strickland*, 466 U.S. at 688, 693. Neither the Petition nor Driver's brief before the Appellate Division addresses the issue in more than a cursory manner. *See* Dkt. 1 at 14, Dkt. 11-13 at 54-55.

For these reasons, Driver is not entitled to habeas relief on the basis of inconsistency in the verdict.

---

[10]    Moreover, the Appellate Division's holding rests on a second independent and adequate state ground, namely, New York's definition of the term "verdict." Under Crim. Proc. Law § 1.20(12), a verdict is "the *announcement* by a jury in the case of a jury trial . . . of its decision upon the defendant's guilt or innocence of the charges submitted to or considered by it" (emphasis added). Because Driver's claim is that only the written verdict sheet, not the oral verdict pronounced in court, was inconsistent, "the alleged inconsistency on the verdict sheet . . . furnishes no basis for reversal." *Driver I*, 64 N.Y.S.3d at 224 (citation omitted).

E.   *The Excessive Sentence Claim*

Finally, Driver argues that his sentence -- a total of sixty-five years'

imprisonment and five years' post-release supervision -- was harsh and excessive.

Before the Appellate Division, Driver formulated this claim solely in terms of state law:

He argued under New York law that the Appellate Division should reduce his sentence

"[a]s a matter of discretion in the interest of justice." N.Y. Crim. Proc. Law § 470.15(3)(c);

*see* Dkt. 11-13 at 55-57.  The Petition does not indicate whether Driver is advancing an

identical state-law claim or a new claim under the Eighth Amendment to the U.S.

Constitution, which bars the imposition of "cruel and unusual punishments." U.S.

Const., amend. viii.

Either way, Driver's claim fails procedurally.  This Court lacks jurisdiction

to review habeas claims alleging violations of state rather than federal law.  *See* 28

U.S.C. § 2254(a).  Because Driver did not present an Eighth Amendment claim to the

New York courts, any such claim is unexhausted, and this Court lacks jurisdiction to

grant habeas relief based on an unexhausted claim.  *See id.* § 2254(b)(1)(A); *see also*

*Andrango v. Chappius*, No. 14 Civ. 7716, 2015 WL 4039839, at *15 (S.D.N.Y. July 1, 2015)

("[A] petitioner's reliance on a state procedural law granting courts discretionary

authority to reduce sentences does not fairly present a federal constitutional claim in

state court that would be cognizable on federal *habeas* review" (citation and internal

quotation marks omitted)).

Even had Driver framed his claim in terms of the Eighth Amendment and presented it to the New York courts, it lacks merit. The Appellate Division expressly held that the "sentence imposed was not excessive," *Driver I*, 64 N.Y.S.3d at 224, and that holding is due "substantial deference," *Fischer*, 780 F.3d at 560. Driver does not deny that he was sentenced within the ranges set forth in the New York Penal Law, *see* Dkt. 11 at 37-38, and "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law," *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Moreover, at a minimum, Driver's actions contributed to one young woman's death and four other individuals' life-altering injuries. His sentence, though long, was not disproportionate to his crimes and, therefore, neither cruel nor unusual under the U.S. Constitution. *See Solem v. Helm*, 463 U.S. 277, 290 ("[A] criminal sentence must be proportionate to the crime for which the defendant has been convicted").

## III.   *Driver's Motion to Appoint Counsel*

On February 10, 2023, Driver moved to be assigned counsel with regard to the Petition. Dkt. 18.

Under the Rules Governing Section 2254 Cases in the United States District Courts, a petitioner must be appointed counsel in any case where "an evidentiary hearing is warranted." Rules Governing Section 2254 Cases in the United States District Courts, Rule 8(c) and Advisory Committee Notes. The determination whether to hold a hearing is at the court's discretion, *see id.* Rule 8(a), as is the

appointment of counsel in cases where an evidentiary hearing is not warranted, *see id.*

Rule 8(c); *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986).

Because I have found that the state courts' decisions in this case did not

rely on an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2), no

evidentiary hearing is warranted.  Likewise, because I have found that, to the extent the

state courts applied federal law, they did not do so unreasonably, *see* 28 U.S.C.

§ 2254(d)(1), there is no need to appoint counsel.  Driver's motion is therefore denied.

## *CONCLUSION*

Driver has failed to show any basis for relief under 28 U.S.C. § 2254.

Accordingly, the Petition, as amended, is denied.  Additionally, I decline to issue a

certificate of appealability because Driver has not made a substantial showing of the

denial of a constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3),

I certify that any appeal taken from this decision and order would not be taken in good

faith.  The Clerk of Court shall enter judgment accordingly and close this case.

The Clerk of Court is respectfully directed to mail a copy of this

memorandum decision and the judgment to Driver at his last address of record.

SO ORDERED.

Dated:    New York, New York
          June 15, 2023

_____
DENNY CHIN
United States Circuit Judge
Sitting by Designation